IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CESAR BARROS, | : CIVIL ACTION NO. 1:14-CV-1746 |
| | : |
| Plaintiff, | : (Judge Kane) |
| | : |
| v. | : (Magistrate Judge Saporito) |
| | : |
| JOHN E. WETZEL, Secretary of Corrections, | : |
| | : |
| | : |
| Defendant. | : |

## REPORT AND RECOMMENDATION

On September 8, 2014, plaintiff  Cesar Barros ("Barros"), prisoner at the State Correctional Institute at Retreat ("SCI-Retreat"), filed this *pro se* §1983 civil rights action.   Barros alleged that Defendant, John E. Wetzel, Secretary of the Pennsylvania Department of Correction, violated his First Amendment free exercise of religion rights by failing to provide him with his gluten free meal as a Ramadan evening meal and by further, not allowing him to take his gluten free meal  back to his cell to eat at the appropriate time.  (Doc. 1).  Barros does not specifically cite the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. §2000cc, *et seq*.; however, it appears

that he is alleging a violation of the statute.[1] (*Id.*).  As relief, plaintiff requests declaratory and injunctive relief.  (*Id.* at 3).

We granted plaintiff's *in forma pauperis* motion and directed the United States Marshal Service to serve plaintiff's complaint on defendant. (Doc. 8).  After we granted the defendant's motion for leave to file a motion to dismiss *nunc pro tunc,* on January 22, 2015, the defendant filed a motion to dismiss plaintiff's complaint for failure to state a claim. (Doc. 16).  On August 5, 2015, we recommended that the motion to dismiss and the request for a preliminary injunction be denied.  (Doc. 34).  The court adopted our report and recommendation on September 29, 2015.  (Doc. 39).  On March 22, 2016, the defendant filed the instant motion for summary judgment (Doc. 53) along with a statement of material facts (Doc. 54) and a supporting brief (Doc. 56). The plaintiff filed an opposition brief and the defendant filed a reply brief.   (Docs. 59, 62). The plaintiff failed to file a response to the defendant's statement of material facts as required by LR 56.1.  The

---

1.  Barros filed a motion for expedited preliminary injunction (Doc. 48) wherein he asserts that his complaint is brought pursuant to RLUIPA.  We will address his request for a preliminary injunction.

plaintiff filed a motion for expedited preliminary injunction (Doc. 48) without a supporting brief.  The defendant filed an opposition brief. (Doc. 57).

For the reasons set forth below, we recommend that the motion for summary judgment (Doc. 53) be granted in part and denied in part, and the request for preliminary injunction (Doc. 48) be denied.

## I.      *Summary Judgment Standard*

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is "genuine" only if the evidence "is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. In deciding a summary judgment motion, all inferences "should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must

be taken as true." *Pastore v. Bell Tel. Co. of Pa.*, 24 F.3d 508, 512 (3d Cir. 1994).

The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion," and demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant makes such a showing, the non-movant must set forth specific facts, supported by the record, demonstrating that "the evidence presents a sufficient disagreement to require submission to the jury." *Anderson*, 477 U.S. at 251–52.

## II.    *Statement of Material Facts*

The defendant moved for summary judgment and submitted several documents in support of the motion. Those documents include copies of Barros's prison grievances and several Declarations from prison officials.   In particular, the defendant submitted a Declaration from Marcia Noles, Chief of the Food Services Division for the Pennsylvania Department of Corrections ("DOC"), which outlined the DOC's efforts to feed 52,000 inmates with a variety of special dietary needs; a Declaration from Kathy Brittain, the Deputy Superintendent

for Centralized Services at SCI-Retreat, regarding the procedure for inmates who participate in Ramadan; and a memorandum from Shawn Kephart, Director, Bureau of Treatment Services, setting forth the 2015 policy memorandum on the observance of Ramadan, and which stated that prison food services would not change the Ramadan evening meals or sahur bags to accomodate inmates who have allergies to certain foods or who receive therapeutic diets.

Barros is a practicing Muslim, who at all times relevant was an inmate at SCI Retreat, and was authorized to receive a non-standard therapeutic diet labeled gluten-free. (Doc. 54, at 1-2). Barros's 2014 request for a religious accommodation, his subsequent grievance related thereto, and his 2015 similar request have been denied pursuant to DOC policy. (Doc. 54, at 2). A therapeutic diet is a diet or dietary regimen prescribed by a physician, physician assistant, dentist, or psychiatrist, used as a therapy for a medical condition as part of an overall health care plan. (*Id.* at 5). Usually, inmates receive their evening meal between 4:30 p.m. and 6:30 p.m. in the dining hall. (*Id.* at 8). Inmates who participate in the Ramadan fast may receive their evening meals when the Ramadan evening meals are served which is

approximately five to ten minutes after sundown following their evening prayers. (*Id.* at 9). Inmates receiving Ramadan meals are also given a sahur bag which they take to their cells along with their Ramadan meals. (*Id.*). The Ramadan evening meal should be eaten immediately while the sahur bag is meant to be eaten before sunrise (approximately 5:40 a.m. to 5:55 a.m.). (*Id.* at 10).

The participation in the Ramadan fast requires that inmates not eat or drink after sunrise and before sunset, and it also requires that inmates alter their medications. (*Id.* at 10-11). Those inmates who receive therapeutic diets or medications are counseled by medical staff prior to the start of Ramadan. (*Id.*). Because of the large number of Muslim inmates who are housed at SCI-Retreat and participate in Ramadan (approximately 120 in 2014), Brittain, further declared that delivering meals would be operationally burdensome and could increase staffing needs for the delivery of meals. (Doc. 54-4, at 10). She also stated that delivering fast meals to a small number of Jewish inmates has minimal impact upon the efficient operations of the institution. (*Id.*).

Further, Food Services claims it is unable to accomodate inmates with documented allergies to certain foods or those who receive therapeutic diets with religious diets. (Doc. 54, at 13). In support of this assertion, the defendant relies upon DC-ADM 819, Religious Activities Procedural Manual Section 1-General Procedures 2.d. which states as follows:

> Food Services is unable to accommodate inmates with documented allergies to certain foods or those who receive Therapeutic Diets with special religious diet bags for holy day observances. An inmate who is currently on a Therapeutic Diet for medical reasons, has a food allergy or is receiving a snack bag, and still wishes to receive a special religious diet bag for an approved holy day observance must sign a Release from Responsibility for Medical Treatment Form (refer to Department policy **13.2.1, "Access to Health Care," Section 1**) prior to being accommodated with a special religious diet bag.

(Doc. 54-1, at 26)(emphasis in original).

In support of this assertion, the defendant maintains that requiring the DOC to provide therapeutic diets for religious feasts, fasts, functions, and holiday meals ("double accommodation") will impact both the 26 DOC institutions and the Central Office. (Doc. 54, at 14). The defendant maintains that institutions will need an increase

in staff in order to administer proper oversight of all of the different types of food being produced for the different types of meals, bag-meal production, food-tray preparation, and meal service or transport for meals fed outside of the dining room, and to insure that the correct meal is being fed to all inmates at the same time. (*Id.*). Further, institutions will suffer greater exposure to liability if an error is made and an inmate who needs a therapeutic diet is served an improper meal, such a standard diet meal or a meal using the incorrect specialized therapeutic menu. (*Id.*). In addition, it is claimed that inmate kitchen workers will have a greater opportunity with more specialized meals being served to single-out a particular individual's food in order to sabotage it or to pass contraband via the meal. *(Id.).* Because therapeutic diets are only prescribed as therapy for a medical condition, any alteration to an inmate's therapeutic diet, whether intentional or unintentional, could cause serious medical harm, including death. Finally, the defendant maintains that these problems raise valid health, safety, and security concerns in addition to increasing the number of such diets that the DOC's dietician will need to create, analyze, and administer during the entire duration of the religious fasts. (*Id.* at 15).

It will also require the need for the Central Office to increase staff to take on additional duties that the dietician will no longer be able to perform such as staff training, institutional audits and involvement, and testing. (*Id.* at 15).

The defendant maintains that the DOC's 26 institutions lack the manpower (both in food services and security) as well as the physical plant facilities, to accommodate every inmate who wants a specialized therapeutic and religious diet specifically for religious fasts, functions, and holidays. (*Id.* at 16). The DOC's Registered Dietician has identified two situations in which the DOC would find it exceedingly difficult and be unable to accommodate an inmate with a diet menu meeting both therapeutic and religious diet needs and, at the same time, providing that inmate with the Recommended Dietary Allowances under the Food and Nutrition Board of the National Academy of Sciences. First, the DOC is unable to accomodate a request from an inmate to receive a non-standard therapeutic diet because of allergies to soy and legumes and  a religious accommodation to receive a no-animal product diet because there are no other readily available good protein sources on which to base a nutritionally adequate diet menu.

Second, the DOC is unable to meet the request of an inmate who receives a non-standard therapeutic gluten free diet and a religious accommodation to receive a Kosher diet because the number of food items that contain gluten and appropriate substitutes, which are both gluten free and certified Kosher are not available at the DOC institutions. (*Id.* at 16-17).

Next, the defendant raises food safety concerns regarding holding meals to eat after sundown and providing gluten free Ramadan bag meals. First, regarding holding meals to eat after sundown, DOC policy requires the establishment of standards and procedures for the preparation and service of all food items to ensure compliance in maintaining the highest professional standards of security, sanitation, physical hygiene, and safety. (*Id.* at 18). DOC policy requires that hot food be held at 140°F or above and cold food be held and served at 40°F or below to prevent foodborne illness. (*Id.*). Over the last three years, the Ramadan evening meal for those participating inmates was served shortly after sundown, i.e. at 8:00 p.m. or later. (*Id.*). If inmates pick up evening meals between 4:00 p.m. and 6:30 p.m. and hold the meal to eat at 8:00 p.m. or later, serious food safety concerns are presented by

holding meals at room temperature for extended periods of time (*Id.).* Meals to accommodate therapeutic diets must be prepared separately from other meals to avoid cross-contamination from food items to which an inmate is allergic. (*Id.*).

Second, regarding providing gluten-free bag meals to an inmate at the usual evening meal time and to hold the bag meal for consumption after sundown requires the bag meal to be shelf-stable. (i.e. food that can be safely stored at room temperature). (*Id.* at 20). Many of the DOC's institutions are located in remote areas and have a limited number of shelf-stable gluten-free products available from food vendors and local markets. (*Id.*) If Barros were to receive a gluten-free bag meal for the month of Ramadan using the limited number of shelf-stable gluten-free products available to DOC institutions, the defendant asserts that Barros's health could be adversely impacted because of the 28-30 day time frame of Ramadan. The registered dietician may be unable to create a gluten-free bag meal which meets or exceeds the Recommended Dietary Allowances under the Food and Nutrition Board of the National Academy of Sciences. (*Id.*).

In December 2014, at SCI-Retreat, ten inmates received therapeutic diets as follows: one type of standard therapeutic diet (two inmates), four different non-standard therapeutic allergy diets (two inmates), equaling six different types of therapeutic diets that must be prepared for ten inmates in addition to mainline, mainline alternative protein, kosher, and no animal products diets, all of which must be properly prepared, handled, and delivered for every meal. (Doc. 54, at 8). As of January 2016, at SCI-Retreat, nine inmates received therapeutic diets as follows: one type of standard therapeutic diet (one inmate), two non-standard therapeutic allergy diets (five inmates), one other non-standard therapeutic diet (three inmates) equaling four different types of therapeutic diets that must be prepared for nine inmates in addition to mainline, mainline alternative protein, kosher, and no animal products diets, all of which must be properly prepared, handled, and delivered for every meal. (*Id.*).

In his complaint, Barros avers that the defendant has directed every state correctional institute in Pennsylvania to stop accommodating every inmate with documented needs for holy observance of fasting. (Doc. 1 at 3).  Barros, who receives a medically

necessary gluten-free diet, asserts that the food services department at SCI Retreat was directed not to change the Ramadan evening meals to accommodate him. (*Id.*). He further states that he was forced to choose between fasting without the benefit of gluten-free meals or violate his religion by not fasting at all, but receiving his gluten-free meals. Barros did not suspend his gluten-free diet and participated in the fast of Ramadan without any food accommodations. (*Id.*). He was compelled to take the special dietary food back to his cell in order to eat after sunset. (*Id.*). Barros was caught with the food items and received a misconduct for taking unauthorized food from the dining room and was sanctioned with a two-week loss of commissary privileges. (*Id.*). He avers that both Muslim and Jewish inmates at SCI Retreat who are participating in a religious fast are permitted to take their meals back to their cells to eat at the appropriate time. (*Id.*). He further avers that he is not allowed to receive his medically necessary gluten-free meal as a Ramadan evening meal or to take the gluten-free meal back to his cell to eat at the appropriate time. (*Id.*). Finally, he claims that he cannot be accommodated because the "Central Office's course of action has prevented an institution from conducting a case-by-case consideration

of this matter." (*Id.*). We have construed his brief in opposition to the motion for summary judgment to reiterate these factual allegations for purposes of complying with LR 56.1. (Doc. 59).

Plaintiff correctly recognized (Doc. 1 ¶8 ) that jurisdiction of this court is pursuant to 28 U.S.C. §1331 and his request for declaratory relief is authorized by 28 U.S.C. § 2201 and Fed. R. Civ. P. 57.

III.   ***Discussion***

The defendant has moved for summary judgment on several grounds.  First, the defendant contends that the undisputed facts show that the DOC's compelling governmental interests in efficient, cost effective food services, and providing safe and nutritious meals prohibit it from providing therapeutic diets for religious feasts, fasts, and functions.  Here, the defendant argues that: (1) the DOC's compelling interest in cost control and program administration prohibit it from providing therapeutic meals during the Ramadan evening meal time; (2) the compelling interest in food safety prohibits the DOC from allowing inmates to hold their therapeutic meals to eat after sundown; and (3) the compelling interest in providing nutritionally adequate food prohibits the DOC from providing plaintiff with gluten-free bag meals

14

for consumption after sundown.  Second, the defendant contends that the DOC policy of elective participation in religious feasts, fasts, and functions is the least restrictive means of furthering its compelling governmental interests in efficient, cost effective food services which provide safe and nutritious meals.

In response to the motion for summary judgment, Barros maintains that conclusory statements that a requested accommodation will bring about substantial administrative and fiscal burdens are insufficient to meet the defendant's burden under Rule 56.  (Doc. 59, at 3).

## 1.    §1983 Claim

Although Barros does not specifically characterize this as an action under 42 U.S.C. §1983, we liberally construe his *pro se* complaint to include a federal civil rights action. Section 1983 provides in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of

15

> the United States or other person within the
> jurisdiction thereof to the deprivation of any
> rights, privileges, or immunities secured by the
> Constitution and laws, shall be liable to the
> party injured in an action at law, suit in equity,
> or other proper proceedings for redress . . . .

42 U.S.C. §1983. Section 1983 does not create substantive rights, but instead provides remedies for rights established elsewhere. *City of Oklahoma v. Tuttle*, 471 U.S. 808, 816 (1985). To establish a § 1983 claim, the plaintiff must establish that the defendants, acting under color of state law, deprived the plaintiff of a right secured by the United States Constitution. *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1141 (3d Cir. 1995). To avoid dismissal for failure to state a claim, a civil rights complaint must state the conduct, time, place, and persons responsible for the alleged civil rights violations. *Evancho v. Fisher*, 423 F.3d 347, 353 (3d Cir. 2005).

The First Amendment to the United States Constitution is made applicable to the states by the Fourteenth Amendment. *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940). It provides, inter alia, that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . ." U.S. Const. amend. I. The

First Amendment offers protection for a wide variety of expressive activities. *See id.* These protections are lessened, but not extinguished, in the prison context, where legitimate penological interests must be considered in assessing the constitutionality of official conduct. *Turner v. Safley*, 482 U.S. 78, 89 (1987). Although prisoners must be afforded "reasonable opportunities" to exercise the religious freedoms guaranteed by the First Amendment, *see Cruz v. Beto*, 405 U.S. 319, 322 n. 2 (1972), imprisonment necessarily results in restrictions on some constitutional rights, including the First Amendment right to the free exercise of religion. *O'Lone v. Shabazz*, 482 U.S. 342, 348–49 (1987). Only beliefs which are both sincerely held and religious in nature are entitled to constitutional protection. *Wisconsin v. Yoder*, 406 U.S. 205, 215–19 (1972); *Dehart v. Horn*, 227 F.3d 47, 51 (3d Cir. 2000); see also *Africa v. Pennsylvania*, 662 F.2d 1025, 1029–30 (3d Cir. 1981) (identifying three indicia of religion as (1) attempting to address "fundamental and ultimate questions having to do with deep and imponderable matters," (2) being "comprehensive in nature," consisting of a "belief system" rather than "isolated teachings," and (3) recognizing the "presence of

17

certain formal and external signs" such as the clergy and observance of holidays).

The parties do not dispute that Barros's sincerely held religious beliefs are entitled to constitutional protection. The question before the court is whether the defendant's practices violated Barros's right to freely exercise those beliefs. To answer this question, the court must consider whether defendant's practices violate the Supreme Court's "reasonableness test." *See Turner*, 482 U.S. at 89; *O'Lone*, 482 U.S. at 349. The test examines four factors: (1) whether the practice in question furthers a legitimate governmental interest unrelated to suppression of expression; (2) whether there are alternative means of exercising First Amendment rights that remain open to prison inmates; (3) the impact that accommodation of the asserted constitutional right will have on others (guards and inmates) in the prison; and (4) whether an alternative practice exists which would fully accommodate the prisoners' rights at de minimis cost to valid penological interests. *Thornburgh v. Abbott*, 490 U.S. 401, 415–18 (1988) (citing *Turner*, 482 U.S. at 89–91). The test's objective "is to determine whether the

regulation is reasonable given the prison administrators' penological concerns and the inmate's interest in engaging in the constitutionally protected activity." *DeHart*, 227 F.3d at 59. However, prison officials are not required to choose the least restrictive means possible in trying to further penological interests, *Thornburgh*, 490 U.S. at 411, and it is the plaintiff's burden to disprove the validity of a regulation or practice. *Williams v. Morton*, 343 F.3d 212, 217 (3d Cir.2003) (citing *Overton v. Bazzetta*, 539 U.S. 126 (2003)).

On the record before us, we conclude that genuine issues of material fact should preclude summary judgment with respect to this claim. Specifically, there is a genuine question as to whether the prison policy, practice, or custom of requiring an inmate to choose between receiving a medically-prescribed therapeutic diet tray and his right to free exercise of religion—i.e., participating in the Ramadan fast violates the "reasonableness test" set forth in *Turner* and *O'Lone*. The court thus finds that Barros has established a sufficient factual dispute with respect to the gravamen of his First Amendment claim to avoid summary judgment. Thus, we recommend that the defendant's motion

for summary judgment be denied as to the First Amendment claim. Further, we find that Barros has established that defendant Wetzel was personally connected to the alleged violation of his First Amendment rights. The record demonstrates that Wetzel, in his capacity as Secretary of the DOC, is charged with establishing the DOC Food Services Policy at the center of Barros's claim.  It is recommended that Barros's  freedom of religion claim under the First and Fourteenth Amendments should proceed against this defendant based upon his role in establishing or maintaining a practice potentially volatile of Barros's First Amendment rights.  *See A.M. ex rel. J.M.K. v. Luzerne Cty. Juvenile Detention. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004); *see also Santiago v. Warminster Twp.*, 629 F.3d 121, 129 (3d Cir. 2010).

### *2.*  **RLUIPA Claim**

Barros also seeks injunctive and declaratory relief. It appears that Barros has sued the defendant in his official capacity of Secretary of Corrections and not in his individual capacity. We shall not construe Barros's complaint to include an individual capacity claim against the defendant as RLUIPA does not permit claims for damages against

government employees in their individual capacities. *Sharp v. Johnson*, 669 F.3d 144, 153-54 (3d Cir. 2012). Thus, to the extent that Barros seeks damages against the defendant in his individual capacity, we recommend that the defendant is entitled to summary judgment as to a claim for damages under RLUIPA.

To the extent that Barros seeks monetary damages against the defendant in his official capacity, we likewise recommend that the defendant is entitled to summary judgment as to a claim for damages against him. The Eleventh Amendment bars claims for monetary damages against state officials in their official capacities absent a valid abrogation of immunity by Congress or consent of the state. *Kentucky v. Graham*, 473 U.S. 159, 169 (1985). Congress has not abrogated the states' immunity against claims for damages under RLUIPA nor has the Commonwealth of Pennsylvania consented to waive these protections. *Scott v. Beard*, 252 Fed. App'x 491, 492-93 (3d Cir. 2007).

Under RLUIPA "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of

the burden on that person . . . is in furtherance of a compelling governmental interest; and . . . is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc-1. RLUIPA defines "religious exercise" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A); *see also Cutter v. Wilkinson*, 544 U.S. 709, 715 (2005).

Although Congress intended RLUIPA to be construed "in favor of broad protection of religious exercise," 42 U.S.C. § 2000cc-3(g), it also "anticipated that courts would apply the Act's standard with 'due deference to the   experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources." *Cutter*, 544 U.S. at 723. Given this perceived intent, the Supreme Court held that when "requests for religious accommodation become excessive, impose unjustified burdens on other institutionalized persons, or jeopardize the effective functioning of an institution, the facility would be free to resist the imposition." *Cutter*, 544 U.S. at 726.

As a threshold matter, the Court notes that RLUIPA does not permit claims against government employees in their individual capacities. *Sharp*, 669 F.3d at 153–54. A RLUIPA cause of action is an official-capacity claim for declaratory and injunctive relief against the defendant, as the DOC official responsible for promulgating the statewide departmental policy on inmate observance of Ramadan.

Turning to the merits of Barros's RLUIPA claim against the defendant, the Third Circuit has adopted a two-step, burden-shifting analysis for such claims. Initially, "[a] plaintiff-inmate bears the burden to show that a prison institution's policy or official practice has substantially burdened the practice of the inmate's religion." *Washington v. Klem*, 497 F.3d 272, 277–78 (3d Cir. 2007).

> For the purposes of RLUIPA, a substantial burden exists where: 1) a follower is forced to choose between following the precepts of his religion and forfeiting benefits otherwise generally available to other inmates versus abandoning one of the precepts of his religion in order to receive a benefit; or 2) the government puts substantial pressure on an adherent to substantially modify his behavior and to violate his beliefs.

*Washington*, 497 F.3d at 280.

Once the inmate has satisfied his burden of showing that his religious practice has been substantially burdened, the burden then

shifts to the defendant "to show that the policy is in furtherance of a compelling governmental interest and is the least restrictive means of furthering this interest." *Washington*, 497 F.3d at 283.  Barros has alleged that the policy at issue, promulgated by the defendant, has forced him to choose between receiving a Ramadan evening meal that does not comply with his medically necessary gluten-free therapeutic diet or a gluten-free therapeutic meal in the dining hall before sundown, which violates his religious tenets.  Barros alleged that, as a result of the policy promulgated by Secretary Wetzel, he is not permitted to take his gluten-free meal back to his cell to eat after sundown, which would permit him to comply with the requirements of his religious beliefs.  He alleged that he has, in fact, received a misconduct and has been sanctioned for attempting to do so. There exists a genuine issue of material fact as to whether Barros's right to freely exercise his religion has been burdened substantially by defendant's refusal to provide him with a medically prescribed therapeutic diet tray during the 28 to 30 day Ramadan fasting period. On the record before the court, a reasonable jury could conclude that the defendant's practice of forcing Barros to choose between a religiously-mandated fasting diet and a

medically-mandated therapeutic diet is a substantial burden to Barros's religious exercise. A jury could also conclude, on the record before the court, that less restrictive means exist for accomplishing the government's objective. Barros's RLUIPA claim, to the extent it seeks injunctive and declaratory relief, should proceed to trial.

We base our recommendation upon the conclusory nature of the defendant's assertions. In addition, portions of the defendant's Statement of Material Facts (Doc. 54) involving the critical issues are left for speculation. For example, the defendant concludes that the DOC lacks the manpower and physical plant facilities to accomodate every inmate who wants a specialized therapeutic and religious diet for religious fast, functions, and holidays. The registered dietician would find it "exceedingly difficult" to accomodate a diet menu requested by Barros. Yet, the DOC policy DC-ADM 819 allows inmates who are on therapeutic diets and who still wish to receive a special religious diet bag may do so provided the inmates sign the DOC's release from responsibility form. This seems to be inconsistent with the defendant's position and as a result it creates genuine issues of fact which a factfinder should resolve.

### 3.     *Request for Preliminary Injunction*

Barros has requested a preliminary injunction. (Doc. 48). Preliminary injunctive relief is extraordinary in nature and should issue in only limited circumstances. *See Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1426–27 (3d Cir. 1994). Moreover, issuance of such relief is at the discretion of the trial judge. *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Chamberlain*, 145 F. Supp. 2d 621, 625 (M.D. Pa. 2001). In determining whether to grant a motion seeking preliminary injunctive relief, courts in the Third Circuit consider the following four factors: "(1) likelihood of success on the merits; (2) irreparable harm resulting from a denial of the relief; (3) the harm to the non-moving party if relief is granted; and (4) the public interest." *United States v. Bell*, 238 F. Supp. 2d 696, 699 (M.D. Pa. 2003).  It is the moving party who bears the burden of satisfying these factors. *Id.* at 699. "Only if the movant produces evidence sufficient to convince the trial judge that all four factors favor preliminary relief should the injunction issue." *Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 192 (3d Cir. 1990).

It is well-established that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see also Tenafly Eruv Ass'n v. Borough of Tenafly*, 309 F.3d 144, 178 (3d Civ. 2002) ("Limitations on the free exercise of religion inflict irreparable injury."). But on the record before us, we are unable to conclude that Barros has established a likelihood of success on the merits of his claims, particularly because there remains a genuine dispute of material fact concerning the impact of this requested accommodations upon the defendant and upon other prison officials and inmates. *See Sovereign Order of Saint John of Jerusalem - Knights of Malta by Coleman v. Messineo*, 572 F. Supp. 983, 990 (E.D. Pa. 1983) (The existence of a factual conflict or of difficult questions of law may create sufficient doubt about the probability of plaintiff's success to justify denying a preliminary injunction."). Moreover, given the public's "strong interest in the efficient and orderly operation of its prison system," we cannot conclude that the public interest favors a preliminary injunction either. *See Riley v. Snyder*, 72 F. Supp. 2d 456, 461 (D. Del. 1999).

27

Therefore, we will recommend that the request for a preliminary injunction be denied.

## V.    *Recommendation*

Accordingly, for the reasons set forth above we recommend that:

1.    The defendant's motion for summary judgment (Doc. 53) be GRANTED IN PART and DENIED IN PART.

2.    The motion be GRANTED as to any construed claim for monetary damages under RLUIPA.  Entry of judgment should be deferred pending further order of court.

3.    The motion be DENIED as to Barros's construed First Amendment claim and the matter should proceed to trial.

4.    The motion be DENIED as to Barros's RLUIPA claim and the matter should proceed to trial.

5.    The plaintiff's request for a preliminary injunction (Doc. 48) be DENIED.

<u>**s/ Joseph F. Saporito, Jr.**</u>
**JOSEPH F. SAPORITO, JR.**
**United States Magistrate Judge**

**Dated: March 2, 2017**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CESAR BARROS, | : CIVIL ACTION NO. 1:14-CV-1746 |
| | : |
| Plaintiff, | : (Judge Kane) |
| | : |
| v. | : (Magistrate Judge Saporito) |
| | : |
| JOHN E. WETZEL, Secretary | : |
| of Corrections, | : |
| | : |
| Defendant. | : |

NOTICE

NOTICE IS HEREBY GIVEN that the undersigned has entered

the foregoing Report and Recommendation dated March 2, 2017.

Any party may obtain a review of the Report and Recommendation

pursuant to Rule 72.3, which provides:

> Any party may object to a magistrate judge's proposed
> findings, recommendations or report addressing a motion
> or matter described in 28 U.S.C. § 636 (b)(1)(B) or making
> a recommendation for the disposition of a prisoner case or
> a habeas corpus petition within fourteen (14) days after
> being served with a copy thereof. Such party shall file
> with the clerk of court, and serve on the magistrate judge
> and all parties, written objections which shall specifically
> identify the portions of the proposed findings,
> recommendations or report to which objection is made
> and the basis for such objections. The briefing
> requirements set forth in Local Rule 72.2 shall apply. A

judge shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Failure to file timely objections to the foregoing Report and

Recommendation may constitute wavier of any appellate rights.


**_s/ Joseph F. Saporito, Jr._**
JOSEPH F. SAPORITO, JR.
United States Magistrate Judge

Dated: March 2, 2017